[Civ. No. 7146.   Third Dist.   July 31, 1945.]

MARY LOZANO et al., Respondents, v. PACIFIC GAS & ELECTRIC COMPANY (a Corporation), Appellant.

[Civ. No. 7147.   Third Dist.   July 31, 1945.]

PEARL G. COHN et al., Respondents, v. PACIFIC GAS & ELECTRIC COMPANY (a Corporation), Appellant.

416

Neumiller & Ditz, George A. Ditz, Thos. J. Straub, John J. Briare and W. R. Dunn for Appellant.

Gumpert & Mazzera, J. Calvert Snyder, Wainard G. Herrick, R. L. Gianelli and J. B. Freeman for Respondents.

PEEK, J.—Respondents by their complaints sought to recover for the alleged wrongful death of their respective husbands and fathers proximately caused by the negligence of appellant. Appellant in its answer to the complaints denied its negligence and charged that the deaths were caused by the contributory negligence of the decedents. The matters were tried before a jury which rendered verdicts for the respondents. Appellant's motion for a new trial was denied and it then perfected this appeal from the judgments entered upon the verdicts of the jury. By stipulation the appeals in both cases were consolidated and are presented on a single reporter's transcript.

On February 25, 1942, appellant Pacific Gas & Electric Company entered into a written contract with Hickinbothom Brothers Construction Division, a copartnership, whereby said company was to furnish electric energy for a shipyard to be constructed by the partnership on Banner Island, Stockton. Under the contract the company agreed to provide all electric energy for "welding crane power and lights for steel shipbuilding." A further provision stated that "customer hereby grants Pacific a right of way over the shortest practical route for any pole lines which it may be necessary to build over Customer's premises for the purpose of making delivery hereunder."

The power service installed by the company, so far as is

material here, consisted of what is termed a tap line composed of three uninsulated copper wires carrying a load of 11,000 volts and was connected with the company's main line which ran along a street adjoining the customer's shipyard. The tap line was carried into the premises on four poles which were approximately 100 feet apart. On the crossarms of the poles were "High Voltage" signs. At the point where the accident occurred the elevation of this line was approximately 43 feet above the ground. The tap line and transformers were the property of the company and were maintained and operated by it. For the most part the tap line ran along the west side of the customer's main building, some fifteen feet therefrom. A spur track, used to bring materials to the plant also ran along the same side of the building but removed from it at an average distance of twenty-five feet. Farther to the west of the spur track, and obliquely under the power line, were work tables and large benches used for prefabricating and welding, as well as platforms for unloading the gondola cars.

On the day of the accident there were three portable floodlight towers and three diesel engine cranes in operation in the yard. The forty-eight foot towers were mounted on rubber tired wheels and carried transformers and cords which could be plugged in at any one of the many socket outlets throughout the yard. The booms on the cranes varied in length from twenty-five to seventy-five feet. Both the cranes and light towers were made of steel but were not posted with warning signs. Ordinarily operations involving smaller and lower equipment only were conducted between the spur track and the building along which the power line ran. However, near the transformer bank and under the end of the line was a clear space where the light towers were frequently used to unload cars at night. According to the testimony it was difficult to tell from the ground whether the towers would clear the wires or not. Mr. E. T. Woodruff, appellant's commercial and industrial power engineer, testified he did not know that the towers were higher than the tap lines and that he made no examination to determine this question, while his brother, E. C. Woodruff, also an agent for the company, testified that during a visit to the plant in July or September he discovered the type of light towers that were being used and found they were higher than he had assumed them to be.

On the morning of the accident, November 13, 1942, Philip

Lozano, a truck helper, and Albert Cohn, a leaderman flanger or welder, were working in the vicinity of the spur track. Cohn and his helper, one McCarty, were finishing work on a plate upon one of the welding tables to the west of the spur track and were in need of another steel plate. This plate was being brought to them by a large movable crane which was carrying the plate dangling from its boom. As the crane approached the spot where the men were working it became apparent that the light tower would interfere with the movement of the crane and that before the crane could come up to the table with the plate it would be necessary to move the tower. Several of the workmen, including Lozano and Cohn, took hold of the tower and started pushing it away. It had traveled ten or fifteen feet when it came in contact with the tap line to the east of the spur track, with the result that Lozano and Cohn received a charge of 11,000 volts of electricity, from the effects of which they died.

It is well established that to constitute actionable negligence three elements must occur: (1) The legal duty to use due care; (2) a breach of that duty; and (3) proximate causation between the breach and the injury. (*Jackson* v. *Utica etc. Co.*, 64 Cal.App.2d 885, 889 [149 P.2d 748] ; *Monroe* v. *San Joaquin etc. Co.*, 42 Cal.App.2d 641, 647 [109 P.2d 720].)

In the present case the duty of appellant to use care so as to avoid injury to persons or property was established by a clear showing that the company owned, maintained and operated the power line in question. (*Jackson* v. *Utica etc. Co., supra; Irelan-Yuba etc. Co.* v. *Pacific etc. Co.*, 18 Cal.2d 557 [116 P.2d 611].) Such duty extended to every person rightfully on the premises and was obviated only as to trespassers and individuals unlawfully there at the time of injury. (*Monroe* v. *San Joaquin etc. Co., supra; Fike* v. *San Joaquin etc. Co.*, 73 Cal.App. 712 [239 P. 344].)

Upon this qualification of the rule appellant predicates its first contention, arguing that as it admittedly had an easement over the owner's realty, therefore the acts of the decedents in pushing the tower against the tap line thereby diverting the energy from the line was an interruption of appellant's use and possession of the premises and a deprivation of the electricity which was its property. With such contention we cannot agree. Obviously if such were the case the very purpose for the installation of the line would be

defeated. In other words it would prevent the very activity for which the line was admittedly installed. ■ The right of way granted to the company to construct, maintain and service its lines on or over the customer's private property was not exclusive of the ordinary use of the property by said owner and its agents or servants. (*Anderson* v. *Southern etc. Co.*, 77 Cal.App. 328 [246 P. 559].)

It is also established that where such contractual relationship is present a duty arises which otherwise would not exist. This rule is recognized with particularity in one of the cases relied upon by appellant (*Hayden* v. *Paramount Prod., Inc.*, 33 Cal.App.2d 287 [91 P.2d 231]). There the court in affirming the judgment of nonsuit stated: "There was no contractual relation between the city and appellant or his employer. The work in which appellant was engaged at the time of his injury had no relation to the business of respondent city." That such relationship may be a determinative feature was also evidenced by the District Court of Appeal in a further case relied upon by appellant (*Leslie* v. *City of Monterey*, 139 Cal.App. 715 [34 P.2d 837]). Furthermore, all of the cases cited by appellant in support of this contention, including the two mentioned herein, were based upon facts which show that the questions therein at issue did not concern persons injured in the exercise of a lawful occupation in a place where they had a right to be and where they were liable to come in contact with high voltage wires.

■ Appellant further urges that it fully discharged every duty it owed the decedents. The issue so presented was purely one of fact for the jury to determine, and we must conclude that under the evidence disclosed by the record the jury was warranted in finding that there was a breach of duty on the part of the company in maintaining its wires as it did. It is now well settled that:

"On the subject of negligence the standard of care is, that one maintaining wires carrying electricity is required to exercise the care that a person of ordinary prudence would exercise under the circumstances. Among the circumstances are the well known dangerous character of electricity and the inherent risk of injury to persons or property if it escapes. Hence, the care used must be commensurate with and proportionate to that danger. [Citing cases.] Specific application of that standard requires that wires carrying electricity must be

carefully and properly insulated by those maintaining them at all places where there is a reasonable probability of injury to persons or property therefrom." (Citing cases.) (*Polk* v. *City of Los Angeles,* 26 Cal.2d 519, at 525 [159 P.2d 931].)

Here the wires were not insulated and the happening of the accident shows that they were not maintained at a sufficient height. (*Anstead* v. *Pacific etc. Co.,* 203 Cal. 634 [265 P. 487] ; *Giraudi* v. *Electric Imp. Co.,* 107 Cal. 120 [40 P. 108, 48 Am.St.Rep. 114, 28 L.R.A. 596].)

The record herein shows that there was ample evidence to permit the jury to conclude that the appellant company could have prevented the accident either by insulating the wires, by placing them at a greater height above the ground, by running them in an underground conduit or by guarding them in some other fashion. ▮ While the appellant was not under an absolute duty to insulate or make the wires safe in any particular manner it was "its duty to make the wires safe under all the exigencies offered by the surrounding circumstances." (*Royal Indem. Co.* v. *Midland Counties Pub. Serv. Corp.,* 42 Cal.App. 628, 632 [183 P. 960].)

▮ The duty of due care with which the company was charged consists not only in the proper installation of the dangerous instrumentality but in the maintenance thereof in a safe condition at all times and places and under the changing circumstances of the particular case. Even if at the outset of the installation of the equipment the company may have been entirely free from fault, yet, if, under changing circumstances, a hazardous condition arose, nonaction or the failure to remedy such condition would constitute culpable negligence. (*Polk* v. *City of Los Angeles, supra; McCormick* v. *Great Western etc. Co.,* 214 Cal. 658 [8 P.2d 145, 81 A.L.R. 678].)

▮ Appellant has sought to remove the instant case from the rule of the Polk case and the cases cited therein on the ground that there was no reasonable probability of injury from the installing of overhead lines, and in support of such position contends that it could not have been supposed to know of the type of operation that would take place in close proximity to. the line or that floodlight towers would be used in the particular area where the accident occurred. The record does not bear out this contention. This area was not set apart or isolated from the other activities of the yard. In fact, the

very nature of the area being free of buildings rendered it, under the circumstances, a most obvious place to park light towers, cranes or similar equipment. It was not necessary for the defendant to anticipate the precise accident which did occur; it was only necessary that from all of the circumstances an accident of the general nature of the one which occurred could reasonably have been anticipated. (*Royal Indem. Co.* v. *Midland Counties Pub. Serv. Corp.*, 42 Cal.App. 628 [183 P. 960] ; *Jackson* v. *Utica etc. Co., supra.*) ▮ In this regard the record discloses that both before and after the installation of the high tension line company agents had notice or knowledge of the fact that large portable equipment such as mobile cranes and floodlight towers was to be used and later saw it in use. According to the testimony of Mr. E. C. Woodruff, he knew on April 14, 1942, that portable light towers were to be used; that he saw them when he was in the yard in July or September of that year but that he did not know they were to be used in the particular area where the accident later occurred. His brother, E. T. Woodruff, knew before the accident occurred that portable floodlight towers were to be used and that motorized mobile cranes were to be part of the equipment but that he understood such equipment would be confined to the area where actual assembly or construction of boats and barges was taking place. E. C. Woodruff further testified he had been told that one inspection was made during the several months the plant was in operation and prior to the fatal accident, but apparently nothing ever came of that inspection. No report was made nor was any action taken except perhaps in respect to the placing of warning signs on the crossarms of the poles. Additional testimony shows that on their several visits to the yards the previously mentioned agents of the company and several others made no inspection to determine the safety of the line as related to the then existing conditions in the yard, or the kind of appliances used in the general vicinity of the line, yet its agents carefully examined the premises with a view of placing the line underground. Under such circumstances it cannot be said that the jury improperly found that the company had actual or constructive notice of the unsafe condition of the premises. ▮ The authorities are uniform in holding that the duty of due care with respect to electric wires and equipment requires reasonably prompt and frequent inspection (*Polk* v. *City of Los An-*

*geles, supra; Stasulat* v. *Pacific etc. Co.*, 8 Cal.2d 631 [67 P.2d 678; *Irelan-Yuba etc. Co.* v. *Pacific etc. Co., supra; Dow* v. *Sunset etc. Co.*, 157 Cal. 182 [106 P. 587] ), and want of substantial compliance with this rule charges the utility with notice of the defective or dangerous condition that diligent inspection would have revealed. In the case of *Roberts* v. *Pacific etc. Co.*, 102 Cal.App. 422, 431 [283 P. 353], this court stated as follows:

"It is well settled that it is the imperative duty of such a company not only to install proper appliances, but also to make reasonable and proper inspection of such appliances, and to use due diligence to discover and repair defects therein, and a failure to do so constitutes negligence. Notice of a defect, in order to charge the company with liability therefor, need not be direct and express; it is enough that the defect has existed for such a length of time that it should have been known." And upon the question of time the court found that failure to inspect the line for a period of two and one-half months created a presumption of constructive notice.

Evidence was offered by appellant to negative this rule by showing that it had substantially complied with the general orders of the Railroad Commission, and from this premise it is now argued that due care on the part of the company was thus established. At most, such a showing would only relieve the company of the charge of negligence *per se.* It does not affect the question of negligence due to the acts or omissions of the company as related to the particular circumstances of the case. The rule has been stated thus: "It does not follow that merely because one has complied with the terms of a statute or ordinance that he is thereby absolved from negligence. One may act in strict conformity with the terms of an enactment and yet not exercise the amount of care which is required under the circumstances." (19 Cal.Jur. 634. See, also, *Campbell* v. *Fong Wan*, 60 Cal.App.2d 553 [141 P. 2d 43] ; *Sickles* v. *Mt. Whitney etc. Co.*, 177 Cal. 278 [170 P. 599] ; *Monroe* v. *San Joaquin etc. Co., supra.*) In other words, the question is whether under all of the circumstances negligence has been shown.

There is no merit in appellant's argument that there was no statutory requirement expressly imposing on it the duty to insulate the wires or to remove them from harm's way. The duty of care exists in the absence of any statute and if care is omitted and injury directly results therefrom liability arises. (*Polk* v. *City of Los Angeles, supra.*)  While the

company adduced some evidence to show that it was not customary practice to insulate power lines carrying loads of 11,000 volts this was not of itself evidence that the company was free from fault in following such practice and could not excuse defendant unless the practice was consistent with the due care necessary under the circumstances. (*Polk* v. *City of Los Angeles, supra.*)

Appellant next contends that as both ends of the tap line were securely fastened to poles it thus maintained a passive condition into which the decedents pushed the metal tower, thereby producing the fatal injuries, and that obviously, therefore, such act on the part of decedents was the sole proximate cause of the accident.

As we have previously stated sufficient evidence was introduced to justify the jury in finding that the company was negligent. The question then remaining for the jury was whether such facts were the proximate cause of the fatal injuries. Like the other essential elements of actionable negligence the question whether the original negligence was the proximate cause of an injury is a proper question for the jury, unless it may be said that the evidence is of such a character that there is no room for a reasonable difference of opinion. (*Jackson* v. *Utica etc. Co., supra; Fike* v. *San Joaquin etc. Co., supra.*)

Applying such rule to the facts and circumstances presented herein we conclude there was ample evidence upon the question of proximate cause which the trial court properly submitted to the jury, and its determination thereon will not now be disturbed. (*Minter* v. *San Diego etc. Co.,* 180 Cal. 723 [182 P. 749].)

Nor do we find merit in appellant's further argument that decedents in engaging to move the tower thereby assumed the risk of the resulting contact and that such defense is separate and distinct from the defense of contributory negligence. Although respondents question the propriety of raising such an issue at this stage of the proceedings, we are not convinced that there is such a clear line of demarcation between the two doctrines as contended by appellant, and therefore we have chosen to discuss the applicability of such principle on its merits. In the case of *Schleif* v. *Grigsby,* 88 Cal.App. 174, 182 [263 P. 255], it is stated:

". . . conceding that the theory underlying the doctrine of assumption of risk may have application to cases outside of this particular relationship of employment [master and servant], it goes no further than the accepted standard of ordinary care under the circumstances. In other words, the doctrine of assumption of risk in other cases does not absolve the wrongdoer of all blame, but places upon the party injured a higher duty if he voluntarily enters a position of known danger." (Citing cases.)

The evidence herein does not disclose a dangerous situation which could be described as either open, obvious or notorious, nor is there any showing that decedents had any knowledge whatever of the danger involved. Though the tower obviously was higher than the tap line even defendant's own witnesses cast doubt upon the ability of one to note the difference from the ground level.

It is also appellant's contention that the judgments are contrary to the law of this state, and it cites in support thereof what is said to be all of the decided cases in this state wherein injuries have resulted when an object similar to that herein comes in contact with power lines. While we agree with the conclusions reached in the cases cited by appellant, the factual situations therein set forth are entirely different from that which is presented in the instant case, and therefore they are inapplicable to the questions herein presented.

Lastly, appellant complains of the ruling of the trial court in excluding as hearsay, on objection by counsel for plaintiffs, certain proffered testimony relating to the substance of conversations at the time the contract was entered into between agents for the company and the customer's managing agent. Such offered proof was apparently designed to show that the customer did not contemplate using portable light towers or cranes in the area where the accident occurred. We are convinced that the trial court was correct in excluding such testimony. The critical time in this case was not when the contract was made nor when the equipment was installed or the operations commenced but it was any reasonable time prior to the happening of the accident when it could have been avoided. (*Dow* v. *Sunset etc. Co., supra.*) Even if the proffered evidence was admissible its refusal was harmless, as similar evidence was admitted in the testimony of the Woodruff brothers. (2 Cal.Jur. § 608, p. 1022.) It cannot be

said that the ruling of the trial court resulted in a miscarriage of justice. (Const., art. VI, § 4½; *Anstead* v. *Pacific etc. Co., supra.*) If this court were to follow appellant's contention and send the case back for a retrial of the issue of negligence in the construction of the line, and the jury found that initially there had been no negligence on the part of the company there would still remain the finding of negligence in the maintenance of the line, and the same verdicts and judgments would logically follow.

The judgments are affirmed.

Adams, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied August 28, 1945, and appellant's petition for a hearing by the Supreme Court was denied September 27, 1945.